# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF SOUTH CAROLINA
# CHARLESTON DIVISION

| | |
|---|---|
| Truauto MC, LLC and<br>TDMC Property Holdings, LLC,<br><br>    Plaintiffs,<br><br>v.<br><br>Textron Specialized Vehicles, Inc., White River Marine Group, LLC, and Wells Fargo Commercial Finance, LLC,<br><br>    Defendants. | Civil Action No. 2:19-cv-1381-RMG<br><br><br>**ORDER AND OPINION** |

Before the Court are Defendants Textron Specialized Vehicles Inc.'s and White River Marine Group, LLC's Motions to Dismiss Plaintiffs' First Amended Complaint (Dkt. Nos. 26, 27). For the reasons set forth below, Defendants' motions are granted.

## I. Background

Plaintiffs TruAuto MC, LLC and TDMC Property Holdings, LLC (collectively the "Plaintiffs") do business in Berkeley County, South Carolina. (Dkt. No. 21 ¶¶ 1-2.) Doug McElveen and Todd Smith own both businesses. (*Id.* ¶ 11.) Around November 15, 2018, McElveen and Smith had a discussion with Cohen Gaskins, the owner of Sportsman Truck & Auto Sales, LLC ("Sportsman"), an E-Z-Go Authorized Dealership and Franchise. (*Id.* ¶ 11.) McElveen and Smith expressed their interest in purchasing Sportsman's building and their becoming an E-Z-Go authorized dealer and franchise owner. (*Id.* ¶ 13.) E-Z-Go's parent company is Defendant Textron Specialized Vehicles ("TSV"). (*Id.* ¶ 12) Gaskins advised Smith and McElveen that "they needed to be in touch with E-Z-Go during the course of the real estate purchase and the transfer and assumption of the inventory and franchise." (*Id.* ¶ 14.) Around November 21, 2018, Smith

texted John Creech, an E-Z-Go representative, to introduce himself and sent Creech a business plan Smith had created. (*Id.* ¶ 17.) Around November 28, 2018, Creech travelled to South Carolina to meet and have dinner with Smith and to discuss the business plan "and the future goals TruAuto had as an authorized E-Z-Go dealer and franchise." (*Id.* ¶ 19.) Discussions continued November 29th, 2018, and Creech advised "Smith that TruAuto needed to apply for financing at Wells Fargo in order to be an approved dealer." (*Id.* ¶ 20.) Around November 30, 2018, Smith finalized the details of the Sportsman purchase with Gaskins and texted Creech to let him know that "the details that Creech needed for the franchise assumption and real estate purchase had been finalized." (*Id.* ¶ 21.) Around December 3, 2018, Smith confirmed to Creech that the paperwork for E-Z-Go was started and "requested an update on obtaining financing paperwork from Wells Fargo. Creech advised that 'the credit [application] gets the ball rolling with them.'" (*Id.* ¶ 22.) Around December 10, 2018, Smith texted Creech, informing him the Sportsman Buy-Sell Agreement, which Creech had previously requested to see, was "completed" and Creech responded that he would "get it rolling" and process the paperwork. (*Id.* ¶ 23.) From December 11 through December 14, 2018, Smith turned over "a series of requested documents and forms to E-Z-Go, including, but not limited to, personal financial information, business plans, and applications." (*Id.* ¶ 24.) Around December 14, Smith informed Creech he was "starting construction in two weeks," presumably at Sportsman, and asked if Creech saw any issues with the paperwork, to which Creech responded "No, I don't but it just has internal process and then goes to [Wells Fargo]. I'll have a better timeline next week." (*Id.*) Around December 20, 2018, Creech told Smith that "TruAuto was approved to be an E-Z-Go Diamond dealer and that he should expect an email from Wells Fargo very soon with the required paperwork." (*Id.* ¶ 25.)

Subsequently Plaintiffs began to work with Wells Fargo to complete the "online Wells Fargo Commercial Distribution Finance application." (*Id.* ¶¶ 27-28.) Around January 15, 2019, Plaintiffs submitted a Confidential Credit Application to TSV. (*Id.* ¶ 32.)

Around January 17, 2019, Smith texted Creech and expressed his concern because Smith had heard through a friend that Defendant White River Marine Group, Inc. ("White River") merged with TSV. (*Id.* ¶ 33.) Creech responded to Smith that "'all is good and can explain . . . there has been some changes and I've been moved to another sales role in the company. We need to have another conference call with your new rep Jeremy.'" (*Id.*) On January 18, 2019, Jeremy Crane, Plaintiffs' new representative at E-Z-Go, stated "everything was fine with Smith's deal and not to worry." (*Id.* ¶ 34.) During this time, Plaintiffs continued to work on their application with Wells Fargo, and Plaintiffs and Wells Fargo discussed the "two closings that needed to take place," namely the "'Real Estate Closing' – 'acquisition of the land and facilities,'" and the "Floor Plan Assumption – 'the purchase of the inventory, franchise rights, parts & accessories, and equipment by the new business entity/borrower." (*Id.* ¶¶ 35-38.) Because the Sportsman closing was approaching, and in order to "speed up the process," Plaintiffs agreed to decrease their credit line application with Wells Fargo from $1,100,000.00 to $950,000.00. (*Id.* ¶¶ 36-37.) Around January 29, 2019, Wells Fargo indicated to Plaintiffs that "'we are approving the loan today . . . . [TSV] will be notified that a $950,000 credit line has been approved.'" (*Id.* ¶ 40.) Around January 30, 2019, Wells Fargo requested additional information from Plaintiffs to finish preparing the loan and finance agreement. (*Id.* ¶ 41.)

Around January 31, 2019, "Smith got a shocking call from one of his friends," indicating that executives from White River had offered Smith's friend "the territory rights to sell Tracker carts because 'E-Z-Go is going away.'" (*Id.* ¶ 42.) Smith told Creech, and Creech responded that

"[Creech] spoke with Crane and he did not think that was the case" and would "'get answers from the top.'" (*Id.*) Around February 4, 2019, two days before Plaintiffs were set to close on their acquisition of Sportsman, Smith texted Creech, "No info? I'm slated to close Wednesday. Probably just gonna close and take the carts and see where it goes!" (Dkt. No. 21-1, Ex. 31.) Smith continued to reach out to Creech and Creech responded, on February 6, 2019, that "Jeremy was working it this morning with his boss. They'll have you something today. I'm letting Jeremy handle since I've been moved. I've done all I can at this point my friend." (Dkt. No. 21 & Dkt. No. 21-1, Ex. 34.). Around February 6, 2019, Plaintiffs executed the Real Estate Agreement and Transfer and Assumption of Floor Plan with Sportsman, whereby Plaintiffs bought, *inter alia*, Sportsman's E-Z-Go franchise and the associated real estate and floor plan. (Dkt. No. 21 ¶ 48.) Around February 18, 2019, TSV contacted Plaintiffs "regarding the buyout" of Sportsman and offered to send new branding stickers for the golf cart inventory purchased by Plaintiffs. (*Id.* ¶ 49.) That same day, TSV sent Plaintiffs a Dealer Agreement. (*Id.* ¶ 50.) On February 19, 2019, TSV voided said agreement. (*Id.* ¶ 51.) Plaintiffs continued to work with Wells Fargo on financing. (*Id.* ¶¶ 52-54.) Around February 28, 2019, a Wells Fargo employee visited TruAuto "requesting to take a floor plan inventory for Sportsman." (*Id.* ¶ 56.) Plaintiffs explained "Sportsman no longer owned the building or the inventory," and on March 8, 2019, Gaskins received a letter from Wells Fargo demanding payment in full for the floorplan. (*Id.* ¶¶ 56-57.)

Plaintiffs filed this action on April 2, 2019 in the Berkeley County Court of Common Pleas. (Dkt. No. 1-1.) TSV and White River removed this action on May 10, 2019. (Dkt. No. 1.) On September 25, 2019, Plaintiffs filed a First Amended Complaint and the Parties' filed a consent motion to amend the complaint. (Dkt. Nos. 20, 21.) Against Defendant TSV, Plaintiffs allege: breach of contract, fraud and misrepresentation, constructive fraud, breach of contract

accompanied by a fraudulent act, breach of fiduciary duty, interference with a contractual relationship, negligence, negligent misrepresentation, promissory estoppel, Unfair Trade Practices Act violation, and Business Opportunity Sales Act violation. Plaintiffs allege interference with a contractual relationship against Defendant White River. Defendant Wells Fargo Commercial Division Finance, LLC filed its Answer to the First Amended Complaint on October 9, 2019. (Dkt. No. 24.) On October 18, 2019, TSV and White River moved to dismiss the First Amended Complaint and Plaintiffs opposed. (Dkt. Nos. 26, 27, 31, 32, 34, 35.)

## II. **Legal Standard**

Rule 12(b)(6) of the Federal Rules of Civil Procedure permits the dismissal of an action if the complaint fails "to state a claim upon which relief can be granted." Such a motion tests the legal sufficiency of the complaint and "does not resolve contests surrounding the facts, the merits of the claim, or the applicability of defenses . . . . Our inquiry then is limited to whether the allegations constitute 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992) (citations omitted). In a Rule 12(b)(6) motion, the Court is obligated to "assume the truth of all facts alleged in the complaint and the existence of any fact that can be proved, consistent with the complaint's allegations." *Eastern Shore Mkts., Inc. v. J.D. Assocs. Ltd. P'ship.*, 213 F.3d 175, 180 (4th Cir. 2000). However, while the Court must accept the facts in a light most favorable to the non-moving party, it "need not accept as true unwarranted inferences, unreasonable conclusions, or arguments." *Id.*

To survive a motion to dismiss, the complaint must state "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Although the requirement of plausibility does not impose a probability requirement at this stage,

the complaint must show more than a "sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint has "facial plausibility" where the pleading "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

A plaintiff alleging fraud is held to a higher standard and "must state with particularity the circumstances" constituting the fraud. Fed. R. Civ. P. 9(b). The circumstances of the fraud are "the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentations and what he obtained thereby." *Weidman v. Exxon Mobil Corp.*, 776 F.3d 214, 219 (4th Cir. 2015) (internal quotation marks omitted). "Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). The second sentence of Rule 9 "allows conclusory allegations of a defendant's knowledge as to the true facts and of defendant's intent to deceive." *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999).

### III. <u>Discussion</u>

#### a. **Breach of Contract, Breach of Contract Accompanied by a Fraudulent Act, and Interference with a Contractual Relationship**

To state a claim for breach of contract, Plaintiffs must sufficiently allege "the existence of a contract, its breach, and damages caused by such breach." *Hotel and Motel Holdings, LLC v. BJC Enterprises, LLC*, 414 S.C. 635, 652 (Ct. App. 2015). To state a claim for breach of contract accompanied by a fraudulent act, Plaintiffs must sufficiently allege (1) a breach of contract, (2) fraudulent intent relating to the breaching of the contract and not just its making, and (3) a fraudulent act accompanying the breach. *Conner v. City of Forest Acres*, 348 S.C. 454, 465-66 (2002). "Having a contract is a prerequisite to proving breach of contract accompanied by a

fraudulent act." *Armstrong v. Collins*, 366 S.C. 204, 223 (Ct. App. 2005). To state a claim for tortious inference with contractual relationships, Plaintiffs must allege: (1) a contract; (2) a defendant's knowledge of the contract; (3) intentional procurement of its breach; (4) the absence of justification; and (5) resulting damages. *Kinard v. Crosby*, 315 S.C. 237, 240 (1993). For a contract to be valid and enforceable, "the parties must have a meeting of the minds as to all essential and material terms of the agreement." *Davis v. Greenwood Sch. Dist. 50*, 365 S.C. 629, 634 (2005). "A valid offer 'identifies the bargained for exchange and creates a power of acceptance in the offeree.'" *Sauner v. Public Service Authority of S.C.*, 354 S.C. 397, 405 (2003) (citing *Carolina Amusement Co. v. Connecticut Nat'l Life Ins. Co.*, 313 S.C. 215, 437 S.E.2d 122 (Ct. App. 1993)).

Plaintiffs' breach of contract and breach of contract accompanied by a fraudulent act claims against TSV both fail because Plaintiffs fail to allege the existence of any contract between themselves and TSV. Plaintiffs do not allege any facts describing a contract nor the purported contract's essential or material terms. Plaintiffs allegations do not identify any bargained for exchange, but instead describe negotiations between themselves and TSV for a dealer agreement. *See Burbach Broadcasting Co. of Del. V. Elkins Radio Corp.*, 278 F.3d 401, 407 (4th Cir. 2002) ("In preliminary negotiations, when not even the basic terms have been agreed upon, courts will not find enforceable binding contracts.").

In their Opposition, Plaintiffs attempt to characterize Smith's sending Creech a "business plan" for an E-Z-Go dealership as the operative "offer." (Dkt. No 31 at 5.) This characterization of the business plan as an "offer" is a new allegation not found in the First Amended Complaint and is procedurally improper. *Zachair, Ltd. V. Driggs*, 965 F. Supp. 741, 748 n.4 (D. Md. 1997) *aff'd* 141 F.3d 1162 (4th Cir. 1998) (on motion to dismiss, "[Plaintiffs are] bound by allegations

in [the] complaint and cannot, through the use of motion briefs, amend the complaint"); *Thomas v. Commr's of Charles Cty.* No. AW-003788, 2001 WL 76418, at *2 (D. Md. Jan 17, 2001) ("The Court will not consider the Plaintiff's new theory and evidence put forth in an opposition to dismiss. When ruling on a motion to dismiss, a court is to consider those facts contained in the complaint, only.").[1] Even if the Court entertained Plaintiff's new, improper factual theory, and drew all reasonable inferences in their favor, the proposition that the "business plan" was an offer is unwarranted because it is contradicted by the remainder of the allegations in the First Amended Complaint. Namely, Plaintiffs allege they: (1) began to turn over "requested documents and forms to E-Z-Go" including "personal information, business plans, and *applications*" between December 11 and 14, 2018, (Dkt. No. 21 ¶ 24) (emphasis supplied); (2) were told they were "approved to be an E-Z-Go Diamond dealer" December 20, 2018, (Dkt. No. 21 ¶ 25); and (3) had a "conference call with [Smith and Creech] to discuss the state of their dealership authorization" on January 18, 2020. These allegations are not consistent with the theory that a valid contract was formed between Plaintiffs and TSV on November 23, 2018, but instead that negotiations were ongoing.

Plaintiffs claim that TSV and White River interfered with Plaintiffs' contractual relations with Wells Fargo, (Dkt. No. 31 at 14), fails because Plaintiffs fail to allege any fact showing TSV or White River interfered with any relationship Plaintiffs may have had with Wells Fargo. While Plaintiffs' First Amended Complaint shows Plaintiffs worked with Wells Fargo to obtain the financing needed to become an approved E-Z-Go dealer, (Dkt. No. 21 ¶¶ 20, 26, 27-31, 40-41, 45-48, 52-54), none of the allegations in the First Amended Complaint show that TSV or White River committed any act to interfere with a specific contract between Plaintiffs and Wells Fargo.

Accordingly, Plaintiffs' first, fourth, and sixth causes of action are dismissed.

---

[1] In their Opposition, Plaintiffs allege a variety of new facts not found in their First Amended Complaint. The Court does not consider these new facts because they are improperly pled.

b. **Fraudulent Misrepresentation and Constructive Fraud**

To establish a claim for fraudulent misrepresentation, Plaintiffs must allege and establish the following elements: "(1) a representation; (2) the falsity of the representation; (3) the materiality of the representation; (4) knowledge of its falsity, or reckless disregard for its truth or falsity; (5) intent that the representation be acted upon; (6) the hearer's ignorance of the falsity; (7) the hearer's reliance on its truth; (8) the hearer's right to rely thereon; and (9) the hearer's consequent and proximate injury." *First Union Mortg. Corp. v. Thomas*, 317 S.C. 63, 71, 451 S.E.2d 907, 912 (Ct. App. 1994) (citing *Ardis v. Cox*, 315 S.C. 512, 431 S.E.2d 267, 269 (Ct. App. 1993)). "The false representation . . . must be one of fact as distinguished from the mere expression of an opinion." *Winburn v. Ins. Co. of N. Am.*, 287 S.C. 435, 440 (1985). "Reasonable, detrimental reliance upon a misrepresentation is an essential element of a cause of action for fraud, and such reliance must be pleaded with particularity." *See Learning Works, Inc. v. The Learning Annex, Inc.*, 830 F.2d 541, 546 (4th Cir. 1987) (citation omitted). The elements needed to establish constructive fraud are identical, except that Plaintiffs do not need to establish the Defendant's intent to deceive. *Pitts v. Jackson Nat. Life. Ins. Co.*, 352 S.C. 319, 333-34 (Ct. App. 2002).

Plaintiffs allege that Creech made assurances to Plaintiffs that they would be approved as an E-Z-Go dealership and would not be affected by a potential merger between TSV and White River. (Dkt. No. 21 ¶ 67.) Plaintiffs contend these assurances were false because TSV never granted Plaintiffs an authorized dealership or franchise and the dealership was granted to a competitor after TruAuto was approved for a $950,000.00 credit line with Wells Fargo. (Dkt. No. 21 ¶¶ 67-68.) Plaintiffs allege they relied on said representations to purchase the real estate, personal property, floor plan and inventory of Sportsman. (Dkt. No. 21 ¶ 71.)

Plaintiffs' fraud-based claims against TSV fail, however, because Plaintiffs have not alleged with particularity reasonable, detrimental reliance. *See Learning Works*, 830 F.2d at 546 (fraud claim must be dismissed where plaintiff does not "sufficiently . . . allege reasonable reliance on [defendant's] misrepresentation"). Specifically, Plaintiffs allege that beginning on January 31, 2019, Smith wrote to Creech asking if E-Z-Go "is going away and [another retailer, Berkeley Outdoors] is gonna have the territory on tracker carts?" (Dkt. No. 21-1, Ex. 30.) Creech responded that he was "trying to get more details," giving his opinion that "I don't think that's case [sic]. I can't see ezgo going away. Once we get an answers [sic] from the top we'll get back with you." (*Id.*, Ex. 30.) Later that day, Smith again wrote Creech: "I hope this is all a mis communication but when my buddy calls me and tells me the president and ceo just left his office it can't be good for me as a ez go dealer. He told me that your president told him that if there's a tracker dealer in the area ez go don't exist?" Creech responded that he was "[t]rying to get in touch with leadership. No call back yet. I'm getting ready to call again. Just give us until tomorrow to get you some answers." (*Id.*, Ex. 30.) On Monday February 4, 2019, two days before buying Sportsmans, Smith wrote Creech, "No info? I'm slated to close Wednesday. Probably just gonna close and take the carts and see where it goes!" followed by an emoticon of a man shrugging. (*Id.*, Ex. 31.) In subsequent texts, Smith stated to Creech that "[t]his deal is starting to be very sketchy" and "I just want somebody to give me some real answers," to which Smith responded that "Jeremy [Plaintiffs' E-Z-Go representative] was working it this morning with his boss. They'll have you something today. I'm letting Jeremy handle since I've been moved." (*Id.*, Ex. 34.)

The above allegations, and specifically the First Amended Complaint's Exhibits 30 and 31, demonstrate TSV never represented to Plaintiffs that they were promised an "authorized dealership and franchise." (Dkt. No. 21 ¶ 68.) To the extent any of TSV's representations could be construed

as "misrepresentations," the First Amended Complaint demonstrates that Plaintiffs nevertheless had doubts based on specific information Plaintiffs acquired by themselves as to whether they would become an authorized E-Z-Go dealer and that, despite these doubts, decided to "just . . . close [and buy Sportsman] and take the carts and see where it goes!" (Dkt. No. 21-1, Ex. 31.) Thus, Plaintiffs fail to plead their reasonable reliance on false representations. *See Learning Works*, 830 F.2d at 546; *see also Hit Prod. Corp. v. Anchor Fin. Corp.*, 111 F. Supp. 2d 273, 728 (D.S.C. 1999), *aff'd* 215 F.3d 1318 (4th Cir. 2000) (reliance on claimed misrepresentations not justified where plaintiff was aware of certain discrepancies and proceeded without investigating to protect its own interest).

Plaintiffs' second and third causes of action are dismissed.

### c. Negligent Misrepresentation

To assert a claim for negligent misrepresentation, Plaintiffs are required to allege "(1) the defendant made a false representation to the plaintiff; (2) the defendant had a pecuniary interest in making the statement; (3) the defendant owed a duty of care to see that he communicated truthful information to the plaintiff; (4) the defendant breached that duty by failing to exercise due care; (5) the plaintiff justifiably relied on the representation; and (6) the plaintiff suffered a pecuniary loss as the proximate result of his reliance on the representation." *Quail Hill, LLC v. Cty. Of Richland*, 387 S.C. 223, 240 (2010). As explained immediately above, as Plaintiffs do not allege with particularity their reasonable reliance on any misrepresentation of TSV, Plaintiffs' negligent misrepresentation claim against TSV fails. *See id.* at 240 ("There is no liability for casual statements . . . or matters which plaintiff could ascertain on his own in the exercise of due diligence.") (citing *AMA Mgt. Corp. v. Strasburger*, 309 S.C. 213, 223, 420 S.E.2d 868, 874 (Ct.App.1992)).

Plaintiffs' eighth cause of action is dismissed.

d. **Breach of Fiduciary Duty**

To establish a claim for breach of fiduciary duty, "the plaintiff must prove (1) the existence of a fiduciary duty, (2) a breach of that duty, and (3) damages proximately resulting from the wrongful conduct of the defendant." *Turpin v. Lowther*, 404 S.C. 581, 589 (2013). "The existence of a fiduciary duty is a question of law for the court." *Id.* A "fiduciary relationship exists when one imposes a special confidence in another, so that the latter, in equity and good conscience, is bound to act in good faith and with due regard to the interests of the one imposing the confidence." *Armstrong v. Collins*, 366 S.C. 204, 221 (Ct. App. 2005) (internal quotation marks omitted). "As a general rule, mere respect for another's judgment or trust in his character is usually not sufficient to establish such a [fiduciary] relationship. The facts and circumstances must indicate that one reposing the trust has foundation for his belief that the one giving advice or presenting arguments is acting not in his own behalf, but in the interests of the other party." *Id.* (citing *Burwell v. S.C. Natl. Bank*, 288 S.C. 34, 41 (1986)). Further, the facts must show "the entrusted party actually accepted or induced the confidence placed in him." *Moore v. Moore*, 360 S.C. 241, 251 (Ct. App. 2004).

Here, Plaintiffs fail to allege that TSV owed it a fiduciary duty. Plaintiffs' allegation that they had a fiduciary relationship with TSV because "[TSV] was the only party in the transaction with the knowledge, skill, expertise, and understanding of dealership authorizations" is factually insufficient and contrary to case law. *See Pitts v. Jackson Nat. Life Ins. Co.*, 352 S.C. 319, 331 (Ct. App. 2002) (describing "an arm's length commercial transaction, which does not give rise to a fiduciary relationship"); *Consolidated Insured Benefits, Inc. v. Conseco Med. Ins. Co.*, No. 03-cv-03211, 2006 WL 3423891, at *15 (D.S.C. Nov. 27, 2006) ("The cases where a fiduciary

relationship has been found by [South Carolina] courts all have a similar component. In each case, the fiduciary is in either a position to advise or act solely on behalf of the other party.") Plaintiffs cite no case law in their Opposition for the proposition that a fiduciary relationship arises in the franchise context. And nowhere in the First Amended Complaint do Plaintiffs provide allegations which show that either TSV accepted or induced the confidence Plaintiffs allegedly reposed in TSV.

For these reasons, Plaintiffs' fifth cause of action is dismissed.

### IV. Negligence and Business Opportunity Sales Act Violation

"In a negligence action, a plaintiff must show that (1) the defendant owes a duty of care to the plaintiff, (2) the defendant breached the duty by a negligent act or omission, (3) the defendant's breach was the actual and proximate cause of the plaintiff's injury, and (4) the plaintiff suffered an injury or damages." *Easterling v. Burger King Corp.*, 416 S.C. 437, 446 (Ct. App. 2016) (quoting *Madison ex rel. Bryant v. Babcock Ctr., Inc.*, 317 S.C. 123, 135 (2006)). "[F]or liability to attach based on a theory of negligence, the parties must have a relationship recognized by law as providing the foundation for a duty to prevent an injury." *Id.* at 446 (quoting *McCullough v. Goodrich & Pennington Mortg. Fund, Inc.*, 373 S.C. 43, 47, 644 S.E.2d 43, 46 (2007)). But "[a]lthough the common law ordinarily imposes no duty to act, an affirmative legal duty may arise from statute." *Williams v. Bank of Am., Nat. Ass'n*, No. 14-cv-4809, 2015 WL 3843251, at *4 (D.S.C. June 19, 2015) (citing *Rayfield v. S.C. Dep't of Corr.*, 297 S.C. 95, 100, 374 S.E.2d 910, 913 (Ct. App. 1988)). "To establish a defendant owes her a duty of care arising from a statute, a plaintiff must show (1) the purpose of the statute is to protect her from the kind of harm she has suffered; and (2) she belongs to the class of people that the statute is intended to protect." *Id.* (citing

*Whitlaw v. Kroger Co.*, 306 S.C. 51, 53, 410 S.E.2d 251, 252 (1991)). "If a plaintiff makes these two showings . . . she has proved . . . that the defendant owes her a duty of care." *Id.*

Plaintiffs allege that TSV breached its duty toward Plaintiffs by: (a) withholding information about TSV's business dealings, specifically TSV's "licensing agreement" with White River; (b) withholding information that TSV might offer territorial rights to another party in Plaintiffs' promised territory; and (c) refusing to speak with Plaintiff when Plaintiff requested information. (Dkt. No. 21 ¶ 101.)

Conceding that South Carolina does not recognize a duty on the part of franchisors toward franchisees, Plaintiffs argue that TSV's duties toward it arise from the South Carolina Business Opportunity Sales Act ("BOSA"). S.C. Code Ann. § 39-57-10 *et seq.* BOSA, however, is not intended to protect Plaintiffs from the type of harms alleged in their First Amended Complaint. BOSA requires the seller of a "business opportunity" to provide a purchaser with certain mandatory disclosures. § 39-57-30 (detailing disclosures). A "business opportunity" is defined as "the sale or lease of any products, equipment, supplies, or services which are sold to the purchaser for the purpose of enabling the purchaser to start a business, for which the purchaser is required to pay the seller a fee." § 39-57-20. Nowhere, however, in their First Amended Complaint do Plaintiffs allege TSV sold Plaintiffs a "business opportunity." Instead, Plaintiffs allege that Plaintiffs purchased Sportsman and the E-Z-Go franchise from Gaskins, (Dkt. No. 21 ¶ 45, Dkt. No. 21-1, Ex. 35), and that Plaintiffs and TSV were in negotiations for Plaintiffs to become an authorized dealer, (Dkt. No. 21 §§ 50-51) (alleging TSV sent and then voided a dealer agreement with Plaintiffs). Because the type of harm Plaintiffs allege are not the types BOSA is intended to protect against, Plaintiffs' negligence claim fails.

Further, Plaintiff's BOSA claim fails as Plaintiffs do not allege anywhere in their First Amended Complaint that Plaintiffs were obliged to pay or paid any fee to TSV as part of obtaining a dealer agreement. § 39-57-20 (a business opportunity is the "sale or lease of any products, equipment, supplies or services which are sold to the purchaser for . . . a *fee*") (emphasis supplied). Plaintiffs' allegations fail to allege the sale of a "business opportunity" as defined by statute. *See* (Dkt. No. 8-1) (Voided Dealer Agreement, §19(d), stating "[Plaintiffs] ha[ve] not paid any fee for this Agreement")

For these reasons, Plaintiffs' seventh and twelfth causes of action are dismissed.

## V.     Promissory Estoppel

"The elements of promissory estoppel are (1) an unambiguous promise by the promisor; (2) reasonable reliance on the promise by the promisee; (3) reliance by the promisee was expected by and foreseeable to the promisor; and (4) injury caused to the promisee by his reasonable reliance." *North Am. Rescue Prod., Inc. v. Richardson*, 411 S.C. 371, 379–80, 769 S.E.2d 237, 241 (2015). Plaintiffs assert that Creech telling Smith on December 20, 2018 that Plaintiffs were approved to be an E-Z-Go Diamond dealer was the promise Plaintiffs reasonably relied on to purchase Sportsmans. (Dkt. No. 21 ¶ 25.)

Plaintiffs claim of promissory estoppel against TSV fails, however, because any reliance on the alleged promise was ultimately unreasonable. When made, a reasonable fact-finder could have concluded that Creech's December 20, 2018 statement to Smith that Plaintiffs had been approved to be an E-Z-Go Diamond dealer was an unambiguous promise on which Plaintiffs could have reasonably relied in acquiring Sportsman. (Dkt. No. 21 ¶ 25.) However, as the Court noted in its analysis of Plaintiffs' fraud-based claims, the First Amended Complaint's Exhibits 30 and 31 demonstrate that after the December 20, 2018 conversation with Creech, and before the

February 6, 2019 closing with Sportsman, Plaintiffs acquired information which caused them to directly question the veracity of Creech's promise. (Dkt. No. 21 ¶ 42.) Namely, on January 31, 2019, Smith learned from a friend that White River had offered "[said friend] territory rights . . . because 'E-Z-Go is going away.'" (*Id.*) Smith told Creech this, adding that this "can't be good for me as a ez go dealer." (Dkt. No. 21-1, Ex. 30.) Creech responded that he would try to obtain "some answers" for Smith. (*Id.*) Further, on February 4, 2019, when Smith had not received answers from Creech, Smith wrote Creech, "No info? I'm slated to close Wednesday. Probably just gonna close and take the carts and see where it goes!" (*Id.*, Ex. 31.) These exchanges demonstrate that after January 31, 2019, Plaintiffs knew their continued reliance on Smith's December 20, 2018 promise was no longer reasonable. (*Id.*, Exs. 30, 31, 34.) Because Plaintiffs "knew of the discrepancies [they] now complain[] of," Plaintiffs cannot plausibly allege they were "justified in relying on" Smith's promise in acquiring Sportsman. *See Hit Products Corp.*, 111 F. Supp. 2d at 728.

For these reasons, Plaintiffs' ninth cause of action is dismissed.

## VI. South Carolina Unfair Trade Practices Act

To state a South Carolina Unfair Trades Practices Act ("SCUTPA") claim, a plaintiff must sufficiently allege "(1) that the defendant engaged in an unlawful trade practice, (2) that the plaintiff suffered actual, ascertainable damages as a result of the defendant's use of the unlawful trade practice, and (3) that the unlawful trade practice engaged in by the defendant had an adverse impact on the public interest." *Ameristone Tile, LLC v. Ceramic Consulting Corp., Inc.*, 966 F. Supp. 2d 604, 621 (D.S.C. 2013). Under South Carolina law, "unfair or deceptive acts have an adverse impact upon the [public] if those acts have the potential for repetition." *Id.* "Potential for repetition can be demonstrated by either 'showing the same kind of actions occurred in the past,

thus making it likely they will continue to occur absent deterrence' or 'showing the company's procedures created a potential for repetition of the unfair and deceptive acts.'" *Id.* (citing *Bessinger v. Food Lion, Inc.*, 305 F.Supp.2d 574, 581 (D.S.C. 2003)). Conduct, however, "'that affects only the parties to the transaction and not the public interest provides no basis for a SCUTPA claim.'" *Id.* Here, even viewing the facts in a light most favorable to them, Plaintiffs plead no facts showing TSV acted similarly in the past nor do Plaintiffs plead nonconclusory facts showing TSV's acts were the results of "specific procedures or business practices that create the potential for repetition." *Machinery Solutions, Inc. v. Doosan Corp.*, No. 3:15-cv-03447, 2016 WL 2756429, at *3 (D.S.C. May 12, 2016) (noting that "[a]bsent specific facts, a plaintiff is merely offering a speculative claim about adverse public impact); *Companion Prop. & Cas. Ins. Co. v. U.S. Bank Nat'l Ass'n*, No. 3:15-cv-01300-JMC, 2015 WL 7568613, at *9 (D.S.C. Nov. 24, 2015) ("The fact that an alleged misconduct occurred is not sufficient to establish that the misconduct amounts to a procedure or business practice.").

Plaintiffs' eleventh cause of action is therefore dismissed.

## VII. Conclusion

For the foregoing reasons, the Court **GRANTS** Defendants Textron Specialized Vehicles, Inc.'s and White River Marine Group, LLC's Motions to Dismiss (Dkt. Nos. 26, 27).

**AND IT IS SO ORDERED.**

Richard M. Gergel
United States District Court Judge

January 2*/*2020
Charleston, South Carolina