# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF SOUTH CAROLINA
# CHARLESTON DIVISION

| | |
|---|---|
| Truauto MC, LLC and<br>TDMC Property Holdings, LLC,<br><br>    Plaintiffs,<br><br>v.<br><br>Textron Specialized Vehicles, Inc., White<br>River Marine Group, LLC, and Wells Fargo<br>Commercial Distribution Finance, LLC,<br><br>    Defendants. | Civil Action No. 2:19-cv-1381-RMG<br><br>**ORDER AND OPINION** |

Before the Court is Defendant Textron Specialized Vehicles, Inc. ("TSV")'s motion for summary judgment. (Dkt. No. 101). For the reasons set forth below, the Court grants in part and denies in part TSV's motion for summary judgment.

## I.   Background

This action concerns Plaintiff TruAuto MC, LLC ("Plaintiff" or "TruAuto")'s efforts to become an authorized dealer of Defendant TSV's E-Z-Go branded golf carts.[1] Doug McElveen and Todd Smith own TruAuto. (Dkt. No. 49 ¶ 11).

Around October 2018, McElveen and Smith had a discussion with Cohen Gaskins, the owner of Sportsman Truck & Auto Sales, LLC ("Sportsman"), an E-Z-Go Authorized Dealership and Franchise. (*Id.* ¶ 11); Smith Deposition, (Dkt. No. 101-1 at 43:1-24). McElveen and Smith

---

[1] On August 13, 2021, by stipulation, Plaintiff TDMC Property Holdings, LLC dismissed its claims against TSV and Defendant Wells Fargo Commercial Distribution Finance. (Dkt. No. 99). By prior order, the Court dismissed Defendant White River Marine Group, LLC from this action. (Dkt. No. 81 at 5 n.3).

1

expressed their interest in purchasing Sportsman's building and becoming an E-Z-Go authorized dealer and franchise owner. (Dkt. No. 49 ¶ 11).

Around November 21, 2018, Smith texted John Creech, an E-Z-Go representative, to introduce himself and sent Creech a business plan Smith had created. (*Id.* ¶ 16). Around November 28, 2018, Creech travelled to South Carolina to meet and have dinner with Smith and to discuss the potential business plan. (*Id.* ¶ 18). Creech advised Smith that all E-Z-Go dealers finance their franchise floorplans with Wells Fargo. (*Id.* ¶ 19).

Around December 10, 2018, "TruAuto, Inc." submitted the Sportsman Buy-Sell Agreement to TSV. (Dkt. No. 101-1 at 52:8-10). This agreement was between TruAuto, Inc. and Gaskins. (*Id.*).[2] That same day, TruAuto, Inc. submitted a credit application to TSV. (*Id.* at 31:13-17). On December 20, 2018, Creech told Smith that the E-Z-Go deal was approved. *See* (*id* at 92:20-23) ("He just called back and said, 'Todd, you guys are approved. I got [] the deal done."); John Creech Deposition, (Dkt. No. 101-4 at 49:16-50:7). Smith testified that at this time he and Creech did not discuss the "terms" of the deal. (Dkt. No. 101-1 at 91:16-22) ("Not really—there wasn't really terms. He basically told me that we had gotten them the documentation they needed, that everything was good to go, and I said, 'Well, where do we go from here?' He said, 'You'll be

---

[2] In its briefing, TSV distinguishes between Plaintiff TruAuto MC, LLC and "TruAuto, Inc." TSV makes this distinction, *inter alia*, to argue that no contract was formed between Plaintiff *TruAuto MC, LLC* and TSV as of December 20, 2018 because (1) TruAuto MC, LLC undisputedly did not exist as of December 20, 2018 and (2) only "TruAuto, Inc." had submitted documents to TSV to apply for an E-Z-Go dealership. *See* (Dkt. No. 101 at 14-15). In response, Plaintiff argues that TSV "knew . . . that a new entity would be created to own and operate the E-Z-Go [d]ealership" and that Tonya Ambrose, TruAuto's CFO, was "told to simply update [TruAuto, Inc.]'s application once the new entity was formed." *See* (Dkt. No. 109 at 4); Tonya Ambrose Deposition, (Dkt. No. 109-3 at 49:2-7; 56:25-57:16); *see also* (Dkt. No. 49 ¶ 25) (alleging that, as of December 20, 2018, "a contract between TruAuto and [TSV] was created for an authorized dealership"). Because the Court must read all facts in a light most favorable to Plaintiff—the nonmoving party—the Court assumes the truth of Ambrose's testimony and declines to consider TSV's arguments to the contrary.

hearing from Wells Fargo.' He goes, 'And as soon as you hear from Wells Fargo, please let me know.'").

On December 20, 2018, TSV's Ryne Drummonds sent Sean Leahy, an employee at Defendant Wells Fargo Commercial Distribution Finance ("Wells Fargo") an email indicating that TruAuto, Inc. was approved to buy out Sportsman. (Dkt. No. 101-6 at 2).  Around December 20, 2018, TruAuto, Inc. began working with Wells Fargo to complete Wells Fargo's online application. (Dkt. No. 49 ¶ 26).

On January 4, 2019, TSV received an email notification that Plaintiff intended to create an entity named "TruAuto Monck's Corner, Inc." (Dkt. No. 101-6). On January 7, 2019, Plaintiff TruAuto was established. (Dkt. No. 101-1 at 185:23-25).  Around January 15, 2019, TruAuto submitted a Confidential Credit Application to TSV. (*Id.* 36:11-25; 37:1-6).

Around January 17, 2019, Smith texted Creech and expressed concern because Smith had heard through a friend that White River Marine Group, LLC ("White River") merged with TSV. (Dkt. No. 49 ¶ 32).  Creech responded to Smith that "all is good and can explain . . . there has been some changes and I've been moved to another sales role in the company.  We need to have another conference call with your new rep Jeremy." (*Id.*).  On January 18, 2019, Jeremy Crane, Plaintiff's new representative at E-Z-Go, stated "everything was fine with Smith's dealership and not to worry." (*Id.* ¶ 33).

Around January 29, 2019, Wells Fargo emailed Plaintiff that it was "approving the loan today with conditions (legal paperwork) . . . [TSV] will be notified that a $950,000 credit line has been approved." (*Id.* ¶ 39).  On January 31, 2019, Wells Fargo sent Plaintiff a letter indicating that Wells Fargo had "conditionally approved [Plaintiff] a credit facility for [TSV]." (Dkt. No. 109-8 at 2).  Activation of the credit facility was contingent upon the completion of various requirements,

3

including "our receipt of notification from [TSV] that you have been approved as a dealer of their products." (*Id.* at 3).

Around January 31, 2019, "Smith got a call from one of his friends," indicating that executives from White River had offered Smith's friend "the territory rights to sell Tracker carts because E-Z-Go [sic] is going away." (Dkt. No. 49 ¶ 42).[3] Smith told Creech this, and Creech responded that "[Creech] spoke with Crane and he did not think that was the case" and would "get answers from the top." (*Id.*). On February 4, 2019, Smith reached out to Creech again and asked for updates. (*Id.* ¶ 44). Creech responded, "[Crane's] boss said he was on top of it Friday and would let us know." (*Id.*). Smith "followed up again later that night" with both Creech and Crane but neither responded. (*Id.*). That same evening, Smith texted Creech and stated, "No info? I'm slated to close Wednesday. Probably just gonna close and take the carts and see where it goes!" Exhibit 31, (Dkt. No. 21-1 at 51).

On February 5, 2019, a day before closing, Smith texted Creech that the "deal was starting to be very sketchy." (Dkt. No. 49-1 at 39). That same day, Ambrose emailed Wells Fargo employee Kevel Purcell asking, "Do you have anything from [TSV] stating that we have been approved as a dealer?" Exhibit 23, (Dkt. No. 49-1 at 37). A few minutes later Purcell wrote back to Ambrose stating, "No.[] What happens is [TSV] issues their final approval and dealer number once all documents are returned to us." (*Id.*). Ambrose then asked if Wells Fargo had "anything showing that we are going to be [an approved dealer]?" (*Id.*). Purcell stated that he would have "Sean call [Ambrose] and discuss if there is something more you can find out from Textron today." (*Id.*).

---

[3] In addition to manufacturing E-Z-Go brand golf carts, TSV also manufactures "TRACKER OFF-ROAD" brand vehicles. (Dkt. No. 101-3 at 44:16-20).

4

On February 6, 2019, Plaintiff closed on Sportsman. Before Plaintiff closed, however, it is undisputed that Smith, Crane, and Robert White, TSV's National Sales Director for Consumer Sales and Used Car Sales, had a conference call. (Dkt. No. 109 at 12); (Dkt. No. 101 at 9). Smith testified:

> Q: I'm not suggesting on February 6th you were told yes or no whether you were going to, but were you told, "Don't close under the assumption that you're going to get one"? It may be yes or no, but don't close on the assumption you're going to get it?
>
> A: No, sir.
>
> Q: Okay.
>
> A: They never even broached that conversation. They're restructuring. They talked about them being confused. They talked about them getting new reps for new territories and figuring things out, and 'Man, we know you guys are big. We've heard about you guys. And we know you guys can kill it. I mean, if anything, it was kind of building me up again.
>
> Q: Did anybody on February 6th tell you that the issues with exclusivity either were not real or were real?
>
> A: No, we never talked about that. And I—I asked them again, I said, 'The gentleman that met with Clint [Smith's friend], y'all tell me was a big-time guy. If he can tell Clint that he's going to be an authorized dealer, why can't y'all tell me?' And they just didn't know how to answer it.
>
> Q: So that was still up in the air on the date of closing. Is that fair to say?
>
> A: Yes, sir.

(Dkt. No. 101-1 at 160:8-161:14); (*Id.* at 148:1-16) (testifying that that "[t]hey never told me not to assume the inventory. They never told me that Clint was going to be the only authorized dealer in Berkeley County. They basically told me, 'We just haven't figured out a way yet for you all to coexist, but we're working on it. And we're going to have something for you in two weeks.'").

For his part, White testified:

5

> A: So I had a conference call that I pulled together with Todd Smith, [Crane], and myself, and the call was . . . we want to move forward with you as an existing dealer. However, you're caught up in a timing issue. We were still, at that point, strategizing what our internal strategy was going to be in the market between our off-road side and our consumer side, but during the state [sic] of that call, and I remember it vividly, I told [Smith] that, [Smith], I cannot tell you not to go buy Sportsman Auto and I cannot tell you not to close on that building, but what I can tell you is do not close on that with the expectation that you would be an authorized E-Z-Go dealer.
>
> . . .
>
> Q: You just testified that you vividly remember telling Todd [Smith] you couldn't tell him not to go through with the buyout; is that right?
>
> A: That's correct. He can go close on that building if he wants to, but not with the expectation that he would have—be an authorized reseller of our product, that he would be onboarded as an authorized E-Z-Go dealer.
>
> Q: But you just testified that you also told him you still wanted to move forward with the partnership with him, right?
>
> A: Yes, absolutely did, and I told him that he needs to give me a few more weeks . . . that he was caught up in some timing, and it was a very cordial conversation. I have much respect for Todd Smith. However, I told him that we were still strategizing on what our sales strategy was internally between our consumer and our off-road business, and we were not ready to make a decision to move forward at this time at that date of that conference call, that I needed a few more weeks.

(Dkt. No. 101-3 at 40:2-17; 41:5-42:2).

White also testified that, seemingly prior to the conference call with Smith, White had a separate phone call with various TSV employees. White testified:

> Q: Okay. This is an e-mail from Jeremy Crane on April 18, 2019, to John Collins with the subject, TruAuto, and in the body of that e-mail, it says there is a conference call on February 6, 2019, with Collins, White, Creech, and Crane. Do you see that?
>
> A: I do, yes.
>
> . . .
>
> Q: Okay. Do you see that it says, we will not move forward with partnership at this time, directly under where it says, conference call?

6

> A: Yes, I see that, yes.
>
> Q: Okay. So from this e-mail, it looks like Jeremy Crane is making a note that he had a conference call on February 6, 2019, with you, John Collins, and John Creech, and that the discussion was that you will not move forward with a partnership at this time?
>
> A: Yes.
>
> Q: Do you recall that phone call?
>
> A: Yes.
>
> Q: Did it occur on February 6, 2019?
>
> A: As I recall, yes.
>
> Q: Do you recall if Todd Smith was told about this phone call on February 6, 2019?
>
> A: No.

(*Id.* at 37:10-38:12).

On February 6, 2019, sometime after the conference call between TSV and Smith, Plaintiff closed on Sportsman. (Dkt. No. 101-1 at 55:1-25).

Around February 18, 2018, Abigail Muldoon, a TSV employee, contacted Plaintiff to get further information on the buyout because TSV's internal system showed that the transaction was still pending. (Dkt. No. 109-15 at 69). That day, TSV emailed Plaintiff an unsigned dealer agreement in TSV's name. (*Id.* at 71). The next day, February 19, 2019, TSV voided the dealer agreement before anyone at TruAuto had reviewed or signed it. (Dkt. No. 101-1 at 131:11-17); (Dkt. No. 101-3 at 71); *see also* (Dkt. No. 109 at 17) ("Early in the morning on February 19, 2019, TSV unilaterally voided the Agreement before TruAuto could print and execute it.").

7

Around February 22, 2019, Crane told Plaintiff that TSV would not finalize a dealer agreement with TruAuto. (Dkt. No. 101-1 at 269:24-25); Jeremy Crane Deposition, (Dkt. No. 101-7 at 44:13- 45:1).

## II.     Pertinent Procedural History

Plaintiff filed this action on April 2, 2019 in the Berkeley County Court of Common Pleas against Textron, Inc., White River, and Wells Fargo. (Dkt. No. 1-1). Textron, Inc. and White River removed this action on May 10, 2019. (Dkt. No. 1). On September 25, 2019, Plaintiff filed its First Amended Complaint (the "FAC"), substituting Textron, Inc. with TSV. (Dkt. No. 21). On October 18, 2019, TSV and White River moved to dismiss the FAC. (Dkt. Nos. 26 and 27). On January 28, 2020, the Court granted both parties' motions in full. (Dkt. No. 40). On February 28, 2020, Plaintiff filed a motion to amend the FAC, (Dkt. No. 49), which the Court granted, (Dkt. No. 62).

In its Second Amended Complaint (the "SAC"), against TSV, Plaintiff asserts claims for breach of contract, fraud and misrepresentation, constructive fraud, negligence, negligent misrepresentation, promissory estoppel, and violation of the South Carolina Unfair Trade Practices Act ("SCUTPA").

On October 5, 2020, TSV moved to dismiss the SAC in its entirety. (Dkt. No. 64). On December 29, 2020, the Court granted in part and denied in part TSV's motion. (Dkt. No. 81). The Court dismissed the SAC's negligence and SCUTPA claims.

TSV now moves for summary judgment on the entirety of Plaintiff's remaining claims. (Dkt. Nos. 101 and 114). Plaintiff opposes. (Dkt. No. 109).

TSV's motion is fully briefed and ripe for disposition.

## III.    Legal Standard

To prevail on a motion for summary judgment, the movant must demonstrate that there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The party seeking summary judgment has the burden of identifying the portions of the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, [which] show that there is no genuine issue as to any material fact and that the moving part is entitled to a judgement as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 & n.4 (1986) (citing Rule 56(c)). The Court will interpret all inferences and ambiguities against the movant and in favor of the non-moving party. *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). Where the moving party has met its burden to put forth sufficient evidence to demonstrate there is no genuine dispute of material fact, the non-moving party must come forth with "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citing Rule 56(e)). An issue of material fact is genuine if the evidence is such that a reasonable jury could return a verdict in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986).

## IV. Discussion

### a. Plaintiff's Breach of Contract Claim

Although the existence of a contract is ordinarily a question of fact for the jury, where the undisputed facts do not establish a contract, the question becomes one of law. *Stevens & Wilkinson of S.C., Inc. v. City of Columbia*, 409 S.C. 568, 578, 762 S.E.2d 696, 701 (2014) (citing *Capital City Garage & Tire Co. v. Elec. Storage Battery Co.,* 113 S.C. 352, 362, 101 S.E. 838, 841 (1920)). A valid and enforceable contract requires a meeting of the minds between the parties regarding *all* essential and material terms of the agreement. *Patricia Grand Hotel, LLC v. MacGuire Enters.,* 372 S.C. 634, 638, 643 S.E.2d 692, 694 (Ct. App. 2007). Thus, for a contract to be binding, material

terms cannot be left for future agreement. *Aperm of S.C. v. Roof,* 290 S.C. 442, 447, 351 S.E.2d 171, 173 (Ct. App. 1986).

The Court grants TSV summary judgment on Plaintiff's breach of contract claim. Contrary to Plaintiff's assertion otherwise, (Dkt. No. 49 ¶ 25)[4], the undisputed evidence—viewed in a light most favorable to Plaintiff, the nonmoving party—does not demonstrate "the existence of facts sufficient for a reasonable jury to find that the parties manifested an intention to be bound by their communications or conduct" as of December 20, 2018. *See Hill Holiday Connors Cosmopulos, Inc. v. Greenfield*, No. 6:08-CV-03980-GRA, 2010 WL 11530830, at *6 (D.S.C. Apr. 8, 2010). As Smith testified, beyond Creech indicating that TSV had "approved" the deal, it is undisputed that the parties did not discuss all the material terms of a dealer agreement between Plaintiff and TSV. *See Stevens & Wilkinson of S.C., Inc. v. City of Columbia*, 409 S.C. 568, 579 (2014) ("[R]egardless of intent, an agreement which leaves open material terms is unenforceable."). Smith and Creech did not discuss the duration of the alleged dealer agreement between Plaintiff and TSV. *See* (Dkt. No. 101-1 at 93:24-94:2) ("Q: Yeah, did you know how long the duration of the dealer agreement that Mr. Creech was saying that you would be approved for? A: No, sir. No, sir."); *Greenfield*, 2010 WL 11530830, at *6 (holding that an oral contract fails where parties never completed negotiations as to essential terms "because a valid contract requires both mutual assent and manifestation of such mutual assent as to all essential and material terms . . . such as price, time, and place"). Further, at the time it closed on Sportsman, Plaintiff knew that it was not yet an authorized E-Z-Go dealer. *See* (Dkt. No. 101-1 at 141:8-12) (testifying that Smith "underst[ood]

---

[4] "On or about December 20, 2018 Creech called Smith . . . . Creech verbally promised Smith that TruAuto was approved as an E-Z-Go Diamond dealer . . . . At this time, a contract between TruAuto and Textron was created for an authorized dealership." (Dkt. No. 49 ¶ 25). *See also* (Dkt. No. 109 at 26) ("TSV voiding the Dealership Agreement was not their withdrawal of a contract offer; it was a breach of contract.")

that there was no absolute guarantee" that Plaintiff would become an authorized E-Z-Go dealer). Plaintiff also knew that, without a signed agreement, it could not sell E-Z-Go golf carts. *See* (Dkt. No. 101-9 at 34) (February 18, 2019 email from Muldoon to Drummonds stating she "spoke with Jayson at TruAuto and he said that he has not seen any forms on his end to sign but would like to get this going. Jayson said they have fully bought out from Sportsman Outdoors and [are] just waiting to get into our portal so they can learn and *start selling with a contract signed*") (emphasis added). *See Caulder v. Knox*, 251 S.C. 337, 345, 162 S.E.2d 262, 266 (1968) ("The intention of the parties should be determined from the surrounding circumstances, as well as from the testimony of all witnesses; and subsequent acts are relevant to show whether a contract was intended. A mere declaration of intent will not give rise to a contract.") (internal citation omitted). In sum, the Court finds that the undisputed evidence shows the "parties intended not to be bound until [a] written contract [was] executed," *Bugg v. Bugg,* 272 S.C. 122, 249 S.E.2d 505, 507 (S.C. 1978) (noting that "[w]here it is determined that the parties intended not to be bound until the written contract is executed, no valid and enforceable obligation will be held to arise"), and thus finds that the parties did not create a contract on December 20, 2018, *see Burbach Broadcasting Co. of Delaware v. Elkins Radio Corp.*, 278 F.3d 401, 406 (4th Cir. 2002) ("It is fundamental to contract law that mere participation in negotiations does not create a binding obligation, even if agreement is reached on all terms. More is needed than agreement on each detail-the parties must have intended to enter into a binding agreement."); *Quintech Sec. Consultants, Inc. v. Intralot USA, Inc.*, No. 2:11-cv-01689-PMD, 2011 WL 5105446, at *3 (D.S.C. Oct. 27, 2011) ("[T]here is

a strong presumption against finding a binding agreement when the parties expressly contemplated the future preparation of and the execution of a formal contract document.").[5]

For the above reasons, the Court grants TSV summary judgment on Plaintiff's breach of contract claim.

### b. Plaintiff's Claims for Fraudulent Misrepresentation, Constructive Fraud, Negligent Misrepresentation, and Promissory Estoppel

TSV argues that it is entitled to summary judgment on Plaintiff's claims for fraudulent misrepresentation, constructive fraud, negligent misrepresentation, and promissory estoppel. TSV notes that "reasonable reliance" is an essential element of each of these causes of action.[6] TSV

---

[5] To the extent Plaintiff argues that the dealer agreement sent to it on February 18, 2019 and voided the next day was a binding contract—or otherwise indicative that a binding contract existed as of December 20, 2018—the Court finds that the undisputed evidence shows it was not. Plaintiff did not read or sign the dealer agreement before TSV voided it. *See* (Dkt. No. 101-1 at 131:11-17); (Dkt. No. 101-3 at 71). At most, the voided dealer agreement was an offer which TSV withdrew via emailed Docusign notification prior to acceptance. *See, e.g.*, *Masonic Temple v. Ebert*, 18 S.E.2d 584, 587 (S.C. 1942) ("It is clear, in the ordinary case, that an offer may be withdrawn at any time before its acceptance, by notice given to that effect to the other party.").

[6] To establish a claim for fraudulent misrepresentation, Plaintiff must allege and establish the following elements: "(1) a representation; (2) the falsity of the representation; (3) the materiality of the representation; (4) knowledge of its falsity, or reckless disregard for its truth or falsity; (5) intent that the representation be acted upon; (6) the hearer's ignorance of the falsity; (7) the hearer's reliance on its truth; (8) the hearer's right to rely thereon; and (9) the hearer's consequent and proximate injury." *First Union Mortg. Corp. v. Thomas*, 317 S.C. 63, 71 (Ct. App. 1994). The elements needed to establish constructive fraud are identical, except that Plaintiff does not need to establish the Defendant's intent to deceive. *Pitts v. Jackson Nat. Life. Ins. Co.*, 352 S.C. 319, 333-34 (Ct. App. 2002). To assert a claim for negligent misrepresentation, Plaintiff is required to prove "(1) the defendant made a false representation to the plaintiff; (2) the defendant had a pecuniary interest in making the statement; (3) the defendant owed a duty of care to see that he communicated truthful information to the plaintiff; (4) the defendant breached that duty by failing to exercise due care; (5) the plaintiff justifiably relied on the representation; and (6) the plaintiff suffered a pecuniary loss as the proximate result of his reliance on the representation." *Quail Hill, LLC v. County of Richland*, 387 S.C. 223, 240 (2010). Finally, the "elements of promissory estoppel are (1) an unambiguous promise by the promisor; (2) reasonable reliance on the promise by the promisee; (3) reliance by the promisee was expected by and foreseeable to the promisor; and (4)

argues that the undisputed record evidence shows that Plaintiff's decision to close on Sportsman in the hopes of becoming an E-Z-Go dealer was unreasonable as a matter of law. (Dkt. No. 101 at 17-22) ("Plaintiffs cannot establish reasonable reliance on TSV's alleged misrepresentations, an element necessary to sustain an action on all of these claims").

As stated above, as of February 6, 2019, Smith "underst[ood] that there was no absolute guarantee" that Plaintiff would become an authorized E-Z-Go dealer. (Dkt. No. 101-1 at 141:8-12). White, however, at the same time he allegedly told Smith not to close on Sportsman with the expectation that TruAuto would be an "authorized dealer," (Dkt. No. 101-3 at 40:4-17), nevertheless "absolutely" told Smith that TSV was "excited" about, and "wanted to move forward," with Plaintiff *as* an authorized E-Z-Go dealer, (*id* at 41:13-20); (*Id.* at 42:25-43:6) (Q: And you did tell [Smith] you were still excited about the opportunity of patterning? A: Yes, yes. We wanted to move forward at that time with onboarding him as an E-Z-Go dealer."). This all *despite* White's explicit knowledge that TSV had decided it would not move forward with a partnership with TruAuto at that time. (*Id.* at 37:30-38:5).

The Court denies TSV's motion for summary judgment as to Plaintiff's remaining non-contract claims. Viewing the above facts in a light most favorable to Plaintiff, the nonmoving party, the Court finds that a reasonable jury could conclude that White and TSV induced Plaintiff into buying Sportsman to "hedge" TSV's bet as to its regional dealer strategy and that TSV did so in a manner whereby TSV could plausibly deny it "promised"— or otherwise "misrepresented"— that Plaintiff would be, or was still being considered as, a potential authorized dealer. *Compare* (*id.* at 42:25-43:6) (Q: Okay. And you did tell [Smith] you were still excited about the opportunity

---

injury caused to the promisee by his reasonable reliance." *North Am. Rescue Prod., Inc. v. Richardson*, 411 S.C. 371, 379–80 (2015).

of partnering? A: Yes, yes. We wanted to move forward *at that time* with onboarding him as an E-Z-Go dealer.") (emphasis added) *with* (Dkt. No. 101-1 at 160:19-20) (testifying that White told Smith TSV was "restructuring" its regional sales strategy) *and* (Dkt. No. 101-3 at 37:30-38:5) (admitting TSV did not intend to proceed with Plaintiff as a partner as of February 6, 2019). Accordingly, considering the arguably "mixed messages" TSV gave Plaintiff on or before February 6, 2019, a jury question clearly exists as to the reasonableness of Plaintiff's closing on Sportsman. *See, e.g.*, (Dkt. No. 101-1 at 148:16-149:8) (explaining that Smith believed if he did not close on Sportsman that "Cohen would get cold feet and back out" of the sale and Clint—Smith's friend—"would have bought [Sportsman]'s inventory, and I wanted to compete against him").

Accordingly, the Court denies TSV's motion for summary judgment as to Plaintiff's non-contract claims. Plaintiff's claims for fraudulent misrepresentation, constructive fraud, negligent misrepresentation, and promissory estoppel shall proceed to trial.

### c. Plaintiff's Damages

In its motion, TSV puts forth various arguments for limiting Plaintiff's damages.

First, to the extent TSV argues that Plaintiff's damages expert W. Ellison Thomas's testimony is not admissible, and that Plaintiff's claims for damages therefore fail in their entirety, (Dkt. No. 101 at 23-28), the Court denies TSV's motion. By prior order, the Court granted in part and denied in TSV's motion to exclude Thomas's expert testimony and opinions. Order and Opinion, (Dkt. No. 115). In said order, the Court excluded Thomas's testimony *only* as to Plaintiff's out-of-pocket expenses. (*Id.* at 4-6). The Court otherwise denied TSV's motion. (*Id.* at 6-11). Thus, the Court rejects TSV's instant argument that Plaintiff's claims "must fail" because Plaintiff "cannot prove any damages."

14

Second, TSV argues that because Plaintiff did not properly mitigate its damages, it is not entitled to damages beyond May 23, 2019. Specifically, TSV argues that on May 23, 2019, TSV undisputedly offered Plaintiff an E-Z-Go dealer agreement. (Dkt. No. 101-1 at 204:4-9) ("Yes, sir. They did make me an offer."). TSV argues that because Plaintiff turned this offer down, and because Plaintiff's damages expert testified that if Plaintiff had accepted this offer Plaintiff would have no damages in this case, the Court must find as a matter of law that Plaintiff did not properly mitigate. *See* (Dkt. No. 101 at 29-30) (arguing that "Plaintiffs should not be entitled to 10 years of lost profits. Instead, Plaintiffs' alleged damages should be limited to the time period between February 19 and May 23, 2019.").

The Court rejects TSV's above argument. While Plaintiff was under an obligation to mitigate its damages, *see Hughes v. Oconee Cty.*, No. 2007-UP-461, 2007 S.C. App. Unpub. LEXIS 438, at *12 (Ct. App. Oct. 11, 2007) ("A party who has suffered injury or damage from the actionable conduct of another is under a duty to make all reasonable efforts to minimize the damages incurred and cannot recover damages that might have been avoided by the use of reasonable care and diligence."), Plaintiff has presented evidence such that a question of material fact exists as to the reasonableness of this mitigation, (Dkt. No. 109 at 34) (arguing that, to mitigate its damages, Plaintiff continued to operate, obtained a Yamaha franchise, and "never stopped pursuing the TruCarts business plan model it submitted to E-Z-Go"). *See* (Dkt. No. 101-1 at 231:1-21) (admitting that TSV offered Plaintiff a dealer agreement around May 2019 but testifying that "[t]hey never told me how long the agreement was going to be or what type of benefit package they could offer us" and further testifying that "[i]t's kind of hard to do business with people you're suing, and they're only giving you the franchise because you're suing them"); *Fewell v. Catawba Power Co.*, 102 S.C. 452, 464, 86 S.E. 947, 950 (1915) (stating one seeking to hold another liable

15

for damages must use *reasonable* efforts to mitigate such damages); *M. C. Heath & Co. v. Postal Telegraph-Cable Co.*, 87 S.C. 219, 234, 69 S.E. 283, 287-288 (1910) (holding there is a duty to minimize damages as a reasonable, prudent person would under like circumstances).

Last, TSV argues that Plaintiff is not entitled to punitive damages. (Dkt. No. 101 at 30-31). Plaintiff's response in opposition does not address this argument. *See generally* (Dkt. No. 109).

The Court grants TSV summary judgment on Plaintiff's claim for punitive damages. *Kuznik v. Bees Ferry Assocs.*, 538 S.E.2d 15, 32 (S.C. Ct. App. 2000) ("To justify an award of punitive damages, a plaintiff must demonstrate the defendants' conduct was willful, wanton, or undertaken with reckless disregard for plaintiff's rights."). This standard must be satisfied with evidence that is "clear and convincing." *See* S.C. Code Ann. § 15-33-135 ("In any civil action where punitive damages are claimed, the plaintiff has the burden of proving such damages by clear and convincing evidence."). Here, TSV argues—and Plaintiff does not dispute—that "there is no evidence that TSV acted wantonly or maliciously," or otherwise intentionally or recklessly, "during Plaintiffs' application process." (Dkt. No. 101 at 31); *see Bryant v. Muskin Co.*, 873 F.32 714 (4th Cir. 1989) (affirming directed verdict dismissing punitive damages claim); *Cohen v. Allendale Coca-Cola Bottling Co.*, 291 S.C. 35, 40-41 (Ct. App. 1986) (reversing jury award of punitive damages).

For the above reasons, the Court grants TSV summary judgment on Plaintiff's claim for punitive damages.

### V.     Conclusion

For the foregoing reasons, the Court **GRANTS IN PART** and **DENIES IN PART** Defendant TSV's motion for summary judgment (Dkt. No. 101). The Court **GRANTS** TSV summary judgment on Plaintiff's claim for breach of contract and Plaintiff's claim for punitive

damages.    TSV's motion is otherwise **DENIED.**    Plaintiff's claims for fraudulent misrepresentation, constructive fraud, negligent misrepresentation, and promissory estoppel shall proceed to trial.

**AND IT IS SO ORDERED.**

s/ Richard Mark Gergel
Richard Mark Gergel
United States District Judge

September 23, 2021
Charleston, South Carolina